IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LA'MONT WALKER,

                          Plaintiff,

  v.                                                    OPINION AND ORDER

SARAH MASON, TIMOTHY HAINES,                    14-cv-752-jdp
GARY BOUGHTON, CAPTAIN L. BROWN,
and JERRY SWEENY,

                          Defendants.

---

Plaintiff La'mont Walker, a prisoner housed at the Wisconsin Secure Program Facility, is proceeding on claims that prison officials violated his due process rights by wrongfully designating him as a gang member and placing him in administrative confinement for more than three years. Before the court is defendants' motion for summary judgment. Dkt. 84. Because I conclude that defendants did not violate Walker's due process rights, I am granting defendants' motion.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials, and are undisputed unless noted otherwise.

A. The parties

Walker was incarcerated at the Wisconsin Secure Program Facility (WSPF) from December 21, 2010 until February 20, 2018. All defendants were employed at WSPF during the relevant time period: Timothy Haines was the warden from March 27, 2011 until March 22, 2014; Gary Boughton has been the warden since March 23, 2014; Lebbeus Brown was a

captain and Security Threat Groups Coordinator; Sara Mason was captain of the Alpha Unit; and Jerry Sweeney was the security director.

**B. Initial placement and administrative confinement at WSPF**

When an inmate arrives at WSPF, an intake form is completed by various staff members which summarizes the inmate's conduct and security history and identifies any program needs. The unit team, consisting of the inmate's social worker, the unit manager, and the officers on duty that day, reviews the intake form and makes a recommendation regarding the inmate's status on the housing unit, including whether the inmate should be placed on administrative confinement. An inmate's initial placement is then reviewed and approved by the security director.

Under Department of Corrections regulations, administrative confinement is an involuntary and restrictive status imposed on inmates whose presence in general population poses a risk to themselves, staff, or other inmates, or because their presence in general population compromises the security and orderly operation of the institution. *See* Wis. Admin Code Ch. DOC 308. Every 30 days, unit staff members assess the inmates on administrative confinement to evaluate their mental health and programming status and to determine whether a promotion or demotion is necessary. Unit staff members record their findings on a form titled, "Review of Offender in Program Segregation, Disciplinary Separation, or Administrative Confinement." Staff recommendations are forwarded to the security director and then to the warden, who makes the final determination regarding whether the inmate should stay in restrictive status housing or move to general population.

In addition to the monthly reviews, inmates in administrative confinement receive an administrative confinement review hearing every six months. At the hearing, an Administrative

2

Confinement Review Committee considers evidence of the inmate's overall conduct, program participation, motivation, and progress. Inmates are invited to give a statement and present evidence. The committee then decides whether the inmate should remain on administrative confinement. If the inmate has been in administrative confinement for more than a year, the warden and the Division of Adult Institutions (DAI) Administrator automatically review the committee's decision and make separate determinations whether the inmate should be kept on or released from administrative confinement.

Inmates on administrative confinement at WSPF are subject to the following conditions:

- 5-10 hours of out-of-cell activity each week, including outdoor and indoor recreation.

- individual classes and group activities, depending on the inmate's progress;

- daily contact with prison personnel, including when meal trays and medications are handed out, during shower times, and transports for appointments and visits;

- ability to participate in high school equivalency diploma programs and correspondence courses;

- at least three 15-minute phone calls each month;

- one hour of video visitations each week;

- 20-minute showers three times a week; and

- a limited amount of property, including a cup, bowl, some food items, a radio or a television, hygiene items, paper, photographs, playing cards, glasses, and ear plugs.

## C. Walker's initial placement in administrative confinement

On September 13, 2010, while he was still at Columbia Correctional Institution (CCI), Walker had received a conduct report for battery and disobeying orders and was penalized with

3

300 days of disciplinary separation. When Walker was transferred from CCI to WSPF on December 21, 2010, he was placed in disciplinary separation. Defendant Mason, captain of Alpha Unit, recommended that Walker be placed on administrative confinement after he was released from disciplinary separation.

Mason made her recommendation on two forms. First, on the intake form that was completed when Walker arrived at WSPF, Mason checked a box recommending that Walker be placed on an administrative confinement "track" after he completed his disciplinary separation. The intake form described three major conduct reports that Walker had received since August 2010. Also, on the intake form, the box for STG [security threat group] was checked "Yes." This portion of the form was completed by the security director's office and was checked "yes" because DOC's computer database lists Walker as having been affiliated with the Gangster Disciples since 2008. Dkt. 95-2 at 8. (According to defendants, Walker was identified by the Milwaukee Gang Crimes Unit as being affiliated with the Gangster Disciples. Walker denies being a member of any gang and says that no Milwaukee law enforcement unit has identified him as being a member of any gang. But he has not submitted evidence refuting defendants' assertion that the Milwaukee Gang Crimes Unit identified Walker as affiliated with the Gangster Disciples.)

After Walker completed his disciplinary separation in December 2011, Mason completed a "Recommendation for Administrative Confinement" form. Dkt. 46-1 at 5. On that form, Mason noted Walker's underlying offense (five counts of robbery with use of force), 30 conducts report in the past three years with most being sustained with major sanctions, and 18 conduct reports within 12 months. Mason wrote that the number of conduct reports "established a pattern of negative behavior and noncompliance" and caused her to conclude

4

that he should be placed in administrative confinement "to maintain the safety and security" of the institution and other inmates. *Id.*

On December 15, 2011, Walker received a "Notice of Review of Administrative Confinement" explaining the reasons he was being considered for administrative confinement, his rights during the review, and his appeal rights. An administrative confinement hearing was held for Walker on December 23, 2011. Walker did not attend the hearing. The committee noted that, since beginning his period of incarceration in July 2008, Walker had received approximately 30 conduct reports, with 18 major conduct reports in last 12 months, including the following that were listed in the decision:

• Attempted to grab at staff through his trap door and stated, "I will pound you fucking silly mother fucker" (360 days in disciplinary separation);

• Sent a letter to the security director with the name of another inmate on it, stating, "I'm going to get out and wait for you to get off work and kidnap you and stick my dick in your pink azz pussy suck on your pretty titties and grip your big azz round booty. After I'm done I'm gone shoot you in the head with my gun ha ha ha" (180 days disciplinary separation);

• Attempted to spit on another inmate during recreation (180 days disciplinary separation);

• Covered cell window with paper, refused staff directive to uncover it, and stated that he was going to hurt staff (180 days disciplinary separation);

• Held his trap, refused orders to remove his arm from the trap, demanded to see a white shirt, and stated, "I don't give a fuck about your orders you know the drill get me a white shirt you fat bitch" (360 days disciplinary separation);

• Attempted to spit out of his cell, refused to stop, covered his cell window and refused orders to place his hands out to be cuffed (300 days disciplinary separation);

• Disobeying orders (90 days disciplinary separation);

• Spit out the side of his cell door, hit another inmate in the face (300 days disciplinary separation);

5

- Disobeying orders and misuse of prescription medication (180 days disciplinary separation);

- Disobeying orders (120 days disciplinary separation);

- Disobeying orders and disruptive conduct after refusing to place his hand back in the trap (240 days disciplinary separation);

- Disobeying orders, disrespect, and disruptive conduct (180 days disciplinary separation);

- Disobeying orders (180 days disciplinary separation); and

- Flooding his cell (240 days disciplinary separation).

The committee members agreed unanimously that Walker should be placed into administrative confinement because of his pattern of negative behavior, including assaults and threats towards staff. Walker did not appeal the decision. He was placed into administrative confinement on December 24, 2011.

**D. Walker's continued placement on administrative confinement**

Walker's first administrative confinement review hearing was held on June 25, 2012. Defendant Mason recommended that Walker remain on administrative confinement. Since his original placement in administrative confinement, he had received one major conduct report for disobeying orders. The Administrative Confinement Review Committee agreed unanimously to Walker's continued placement, relying primarily on his conduct report history. Walker appealed the decision to Warden Haines, and on July 5, 2012, Haines agreed with the committee's decision. Haines noted that Walker's conduct report history was extensive, and although Walker had been participating in programming and was making progress towards earning his high school equivalency diploma, Haines did not think that Walker's behavior had improved enough to justify release from administrative confinement. The DAI Administrator, affirmed the decision to keep Walker in administrative confinement.

Walker's second administrative confinement review hearing was held on December 19, 2012. Mason again recommended that Walker remain in administrative confinement status due to his conduct report history, disrespect for staff, and pattern of noncompliance with the rules. Since Walker's previous administrative confinement review hearing, Walker had not received any conduct reports, but he had received two warnings for being disrespectful to staff. Walker also had enrolled recently in the High Risk Offender Program (HROP), which is a three-phase program designed to facilitate the reintegration of inmates on administrative confinement status back to general population. The program provides inmates with serious or chronic behavioral issues an opportunity to acquire the skills needed for successful re-integration into a general population setting. As the inmate progresses through each phase, he gets more privileges, with the end goal of being released into general population. Movement within the program is performance based and is determined by the inmates' compliance with the program and the risk posed by each individual inmate. If an inmate competes HROP successfully, the inmate will be recommended for placement in general population.

On December 19, 2012, the committee decided that Walker should remain in administrative confinement. Because Walker had been in administrative confinement status for one year, Haines automatically reviewed the decision. Haines affirmed the decision to keep Walker in administrative confinement, concluding that Walker was showing progress but was not yet ready for general population. The DAI Administrator likewise affirmed Walker's continued placement on administrative confinement.

Walker's third administrative confinement review hearing was held on June 26, 2013. Mason recommended that Walker remain on administrative confinement because he continued to be disrespectful to staff, had received a warning for being disruptive, and was still

7

in the first phase of HROP. The committee, Haines, and the DAI Administrator agreed that Walker should remain on administrative confinement.

Walker's fourth administrative confinement review hearing was held on November 27, 2013. Walker had not received any warnings or discipline since the last review period, but the committee recommended that Walker remain on administrative confinement status. In reviewing the committee's decision, Haines noted that Walker had moved up to the second phase in HROP and was displaying better behavior. Haines concluded that because Walker's conduct history was so extensive, Walker needed to show more progress in respecting staff and complying with rules. Haines concluded that Walker should remain on administrative confinement until he had completed the three phases of HROP. The DAI Administrator affirmed Walker's continued placement in administrative confinement.

Walker moved up to the final phase of HROP in December, 2013. His next administrative confinement review hearing was held on May 23, 2014. (Haines had left WSPF by this time.) During the May 23 review hearing, the committee recommended that Walker stay on administrative confinement status. During Warden Boughton's review, he noted that Walker had shown progress in administrative confinement by completing some programming while in HROP and moving his way up to the final phase of the program. Walker's attitude and social interactions had also improved and he had not received any conduct reports since May 2012. He was participating in schooling and treatment, but was not yet participating in a work program, which is an expectation while in the final phase of HROP. Boughton concluded that Walker should remain in administrative confinement until he completed HROP so that he would have the best chance of successfully reintegrating to general population.

8

At the time of Walker's August 21, 2014 risk assessment, the unit team decided that he had successfully completed HROP and recommended that he be transferred to general population. Boughton approved the transfer on August 25, 2014. Walker was released from administrative confinement and placed in general population on September 11, 2014, as soon as a bed became available.

ANALYSIS

Walker was granted leave to proceed on a claim that prison officials wrongfully designated him as a gang member and placed him in administrative confinement at WSPF for more than three years without due process. Earlier in this case, I dismissed Walker's claim regarding his initial placement in administrative confinement because he had failed to exhaust his administrative remedies for that claim. Dkt. 72. But I allowed Walker to continue with his claim that the periodic reviews of his ongoing placement in administrative confinement between 2012 and 2014 violated his due process rights.

To prevail on his due process claim, Walker must show that (1) defendants deprived him of a "liberty interest" or "property interest"; and (2) he did not receive all the process he was due. *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010). Defendants contend that Walker cannot prevail on his due process claim because he cannot show that his continued placement in administrative confinement deprived him of a liberty interest. Additionally, they contend that Walker received all the process he was due under the Constitution.

A prisoner has a liberty interest in avoiding particular conditions of confinement only if those conditions pose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting

9

*Sandin v. Conner*, 515 U.S. 472, 483–84 (1995)). A prisoner's placement in segregation may create implicate a liberty interest "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009). *See also Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). Defendants argue that although Walker was held in administrative confinement for more than three years, his conditions in administrative confinement were not "unduly harsh." He could leave his cell for a few hours every week, he interacted with staff every day, he received adequate clothing and other property, he could have a television or radio, and he could participate in out-of-cell programming and visits.

Defendants also argue that Walker's *continued* placement in administrative confinement, particularly where he was earning additional privileges as he progressed in HROP, did not deprive him of a liberty interest. As defendants point out, the Court of Appeals for the Seventh Circuit has stated the due process requirements are triggered when an inmate is transferred to a more-restrictive prison setting. *Lagerstrom v. Kingston*, 463 F.3d 621, 623 (7th Cir. 2006). But defendants argue that the court of appeals has not squarely addressed whether prison officials must give an inmate specific process each time they decide to *keep* the inmate in administrative confinement in conditions similar to those in which Walker was housed. Instead, the court of appeals has made statements suggesting that the requirements of due process may not be triggered in such circumstances. *See, e.g., id.* ("[T]he liberty interest . . . is derived from the drastic change in the conditions of confinement. That kind of change might not be present if, for example, the inmate was already confined to segregation."); *Gibson v. Pollard*, 610 F. App'x 571, 573–74 (7th Cir. 2015) ("Gibson already was in administrative confinement when he was sent to *disciplinary* segregation for two months, so his *return* to administrative confinement . . .

could not have raised additional due-process concerns.") (emphasis in original); *Furrow v. Marberry*, 412 F. App'x. 880, 883 (7th Cir. 2011) ("[T]he liberty interest . . . is derived from the drastic change in the conditions of confinement, and that degree of change is likely to be absent if the inmate is already confined to segregation.").

On the other hand, the court of appeals has stated that the Constitution requires prison officials to periodically review whether an inmate placed in administrative segregation continues to pose a threat or whether the inmate can be transferred to less restrictive housing. *Isby v. Brown*, 856 F.3d 508, 528 (7th Cir. 2017); *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012) (citations omitted). Additionally, the court of appeals has instructed judges to be "alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015).

Ultimately, I need not resolve the question whether Walker's continued placement in administrative confinement under the conditions discussed above deprived him of a liberty interest, because it is clear that Walker cannot satisfy the second prong of his due process claim. Walker's due process claim is based on his mistaken belief that he was kept on administrative confinement because defendants thought he was affiliated with a gang. He alleged in his complaint that he was never given the opportunity to show that he had no gang affiliation. But the undisputed evidence shows that defendants did not place Walker on administrative confinement initially or keep him on administrative confinement for more than three years because they thought Walker was affiliated with a gang. The numerous recommendations and decisions by defendant Mason, the Administrative Confinement Review Committee, and Wardens Haines and Boughton do not mention Walker's gang affiliation at

11

all. Instead, the decisions discuss Walker's criminal convictions, conduct report history, attitude, behavior toward staff, and progress through HROP.

An inmate who is facing transfer to a more restrictive prison setting is entitled to "informal, nonadversarial due process." *Westefer*, 682 F.3d at 684–86. As applied to this case, defendants were constitutionally required to give Walker notice of their rationale for placing and keeping him in administrative confinement and an opportunity to present his views. *See id.* Defendants were not required to provide full hearings, but they were required to undertake a meaningful review of Walker's characteristics and progress. *See Isby*, 856 F.3d at 528 (periodic review of segregation placement may not satisfy due process if it consists only of "two boilerplate sentences" and fails to consider updated circumstances). The evidence shows that Walker received an appropriate level of process. Each time the Administrative Confinement Review Committee considered Walker's placement, Walker was provided a notice of the hearing date and was invited to provide a statement and evidence. After each hearing, defendants provided a statement of reasons for their decision, considering both Walker's history and recent progress or lack thereof. Walker was given the opportunity to appeal the decision to both the warden and DAI Administrator. Once Walker had demonstrated sufficient progress through completion of HROP, he was released into general population. In short, Walker received more process than was required under the Constitution. Therefore, defendants are entitled to summary judgment on his due process claim.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 84, is GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

   Entered March 25, 2019.

                                              BY THE COURT:

                                              /s/
                                              _____
                                              JAMES D. PETERSON
                                              District Judge